## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 6:2**1**-CR-155-CEM-LHP

JESUS EMANUEL PIMENTEL ENRIGUEZ

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Roger B. Handberg, United States Attorney for the Middle District of Florida, and

the defendant, JESUS EMANUEL PIMENTEL ENRIGUEZ, and the attorney for

the defendant, Nicole Mouakar, mutually agree as follows:

### A.    **Particularized Terms**

1.    Count Pleading To

The defendant shall enter a plea of guilty to Count One of the

Indictment. Count One charges the defendant with conspiracy to possess with intent

to distribute cocaine internationally, in violation of 21 U.S.C § 963.

2.    Minimum and Maximum Penalties

Count One is punishable by a mandatory minimum term of

imprisonment of ten (10) years up to Life, a fine not more than ten (10) million

dollars, a term of supervised release of at least five (5) years, and a special assessment

of $100 per felony count for individuals. With respect to certain offenses, the Court

shall order the defendant to make restitution to any victim of the offense, and with

Defendant's Initials **J P E**

respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.     Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

> First:     two or more people in some way agreed to try to accomplish a shared and unlawful plan to import more than 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, into the United States; and

> Second:   the defendant knew the unlawful purpose of the plan and willfully joined in it.

4.     No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

5.     Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to

Defendant's Initials  $\underline{\text{PE}}$        2

recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

6. Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant

Defendant's Initials ⎯⎯ P E          3

agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      7.    Safety Valve Provision

The United States will recommend to the Court that it impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, pursuant to USSG § 5C1.2, if the Court finds that the defendant meets the criteria set forth in 18 U.S.C. § 3553(f). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

      8.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. §§ 853(a)(1) and (2), whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

Defendant's Initials      4

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's

Defendant's Initials ___ $PG$     5

sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

Defendant's Initials $\underline{\int P \mathcal{E}}$          6

## B. Standard Terms and Conditions

### 1. Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

### 2. Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from

Defendant's Initials __J P E__          7

imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in

Defendant's Initials _J_ P F            8

which he] has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6. Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court,

Defendant's Initials _JPE_     9

with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

Defendant's Initials __J P E__         10

8. Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9. Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10. Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that

Defendant's Initials _J P K_      11

defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no

Defendant's Initials ‾J‾ PƐ          12

other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 2ⁿᵈ day of May, June, 2022.

ROGER B. HANDBERG
United States Attorney

_____
Jesus Emanuel Pimentel Enriguez
Defendant

_____
Shawn P. Napier
Assistant United States Attorney

_____
Nicole Mouakar, Esq.
Attorney for Defendant

_____
Michael P. Felicetta
Assistant United States Attorney
Chief, Orlando

Defendant's Initials  JPF          13

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:2⅃-CR-155-CEM-LHP

JESUS EMANUEL PIMENTEL ENRIQUEZ

### PERSONALIZATION OF ELEMENTS

First:      Did two or more people in some way agree to try to
            accomplish a shared and unlawful plan to possess or
            distribute more than 5 kilograms of a mixture and
            substance containing a detectable amount of cocaine, a
            Schedule II controlled substance, in the United States?

Second:     Did the conspiracy involve importing 5 kilograms or more
            of cocaine into the United States?

Third:      Did you know of the unlawful purpose of the plan and
            willfully join in it?

Defendant's Initials _J_P€_              14

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO: 6:21-CR-155-CEM-LHP

JESUS EMANUEL PIMENTEL ENRIQUEZ

### FACTUAL BASIS

Beginning on or about May 28, 2021, and continuing through on or about December 8, 2021, in the Middle District of Florida, and elsewhere, the defendant, Jesus Emanuel Pimentel Enriquez, did knowingly, willfully, and intentionally conspire with other persons, both known and unknown to the United States, to distribute a controlled substance, which violation involved 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing, intending, and having reasonable cause to believe that such substance would be unlawfully imported into the United States.

Specifically, on May 28, 2021, a Homeland Security Investigations (HSI) Confidential Informant (CI), met with two individuals from Dallas, Texas. These individuals were later identified as co-defendants, Jesus Emanuel Pimentel Enriquez and Tomas Borjas Mendez. According to the CI, both traveled to Sanford, Florida, for the purpose of purchasing an United States registered Gulfstream GIII, tail number N400AA. The CI stated that the co-defendant said he was an aircraft mechanic. The CI found it suspicious that during the meeting the co-defendant did not ask any mechanical questions, nor did he inspect the aircraft in any meaningful

Defendant's Initials ____JPE____                15

way. The CI stated that it appeared they were only interested in the interior of the aircraft and if it would start.

According to the CI, neither the defendant or the co-defendant asked to see the logbooks for the aircraft. Throughout the aviation industry logbooks are one of the most important items to be examined prior to the sale of an aircraft. Specifically, logbooks contain the entire history of the aircraft maintenance; therefore, logbooks are one of the primary items examined when purchasing an aircraft. After looking at the aircraft for less than an hour, the defendant agreed to purchase the aircraft for \$600,000.00 and requested to pay cash. The CI agreed to receive the payment in cash and stated that the defendant said he needed time to collect the money.

### CI Meetings with co-defendant and defendant

Between May 28, 2021, and June 14, 2021, the CI met either the ~~co-~~defendant alone, or the co-defendant and the defendant together approximately eight times[1] for the purpose of showing him various aircraft that were for sale. According to the CI during an early meeting the defendant admitted to the CI that the GIII being purchased was going to be used to smuggle cocaine. The CI stated that the defendant told him that the aircraft would only be used once or twice and then destroyed. According to the CI, the defendant stated that the interior of the aircraft would be removed so that the aircraft could hold up to 2,500 kilograms of cocaine. The defendant also discussed having a drug trafficking operation in Canada and the

---

[1] The initial encounters were not recorded. However, most of the interactions were recorded. When quotations are listed below that indicates that a recording took place.

Defendant's Initials ⟋ Ｐ Ｅ          16

difficulty associated with moving money from Canada to Mexico because the money had to be shipped via vessels in the ocean.

## June 3, 2021 Meeting

On June 3, 2021, the defendant met with the CI at the Sanford International Airport to look at another aircraft. Because the previous discussion was not recorded, the CI was instructed to clarify the details of the defendant's drug trafficking and the intended use of N400AA (the U.S. registered Gulfstream he was seeking to purchase). This conversation was recorded. The following is an excerpt[2] of that conversation:

**CI:** *So you don't care about the interior?*

**ENRIQUEZ:** *No. the interior, take off all of them*

**ENRIQUEZ:** *my interest in the aircraft is the engine and the flight.*

**CI:** *but the interior doesn't matter*

**ENRIQUEZ:** *Yes, because it's not needed.*

**CI:** *So you have the money here now?*

**ENRIQUEZ:** *No*

**CI:** *you said it was in Atlanta*

**ENRIQUEZ:** *Yeah, but not all of it. I have 200*

**CI:** *200?*

---

[2] This is intended to be a verbatim transcript, however, there may inadvertently be errors that are unintentional.

Defendant's Initials J P E          17

**ENRIQUEZ:** *Yeah, but I have more in Chicago and Charlotte.*

**CI:** *Are they on their way?*

**ENRIQUEZ:** *Chicago not yet, but Charlotte yeah*

**CI:** *So when are we going to close?*

**ENRIQUEZ:** *Maybe Next week*

**CI:** *When will you bring the money from Canada here?*

**ENRIQUEZ:** *Maybe one month It's every month*

**ENRIQUEZ:** *You can do it every month?*

**CI:** *Yes. I can. I'll just keep paying him. Long as I pay him, he's happy*

**ENRIQUEZ:** *you pay maybe ten thousand? It's good*

**CI:** *I told him that. I said instead of five I'm going to pay you ten to take care of this*

**ENRIQUEZ:** *Every month.*

**CI:** *yeah*

**CI:** *So how much in a Gulfstream? How many kilos?*

**ENRIQUEZ:** *In this? Two thousand and a half*

**CI:** *Twenty five hundred kilos?*

**ENRIQUEZ:** *Yeah*

**ENRIQUEZ:** *You take out all of the shit, all of it*

**CI:** *I see.*

The defendant went on to explain to the CI that the aircraft he purchases and uses can only be used two times. The defendant explained that the aircraft is burned

Defendant's Initials _J P G_       18

or broken up, loaded onto barges or ships and sunk in the ocean. The CI asked if he/she could purchase the aircraft back after they are used instead of them being destroyed. The defendant explained that drug dogs could alert to the aircraft. The CI proposed leasing the aircraft to the defendant if he would not destroy them. The CI told the defendant he would be willing to purchase the aircraft back after they were used. The defendant agreed and told the CI he would keep the interiors safe in a warehouse until after the aircraft was used.

## June 7, 2021 Meeting

On June 7, 2021, the defendant met with the CI at a local restaurant to discuss their business. Their conversation was recorded. The following is an excerpt of the conversation:

**CI**: *You're doing like two thousand, five hundred kilos right?*

**Enriquez***: Yeah two thousand, five hundred. It's good*

**CI**: *Yeah, whenever you're ready you let me know*

**Enriquez:** *Its good, every month*

**CI:** *Yeah. So when will you be ready*

**Enriquez:** *maybe in twenty three days. It's every month*

**CI:** *Yeah. If you've been using a ship, that's no good*

**Enriquez:** *Too much time.*

**CI:** *With your brother getting all the money in Canada, does that mean your selling the coke in Canada?*

Defendant's Initials ___ P E          19

**Enriquez:** *Yeah*

**CI:** *No U.S.?*

**Enriquez:** *Canada and U.S.*

**Enriquez:** *For one kilo, its one hundred thousand*

## June 8, 2021 Meeting

On June 8, 2021, the defendant met with the CI and an HSI Orlando

Undercover Agent posing as a corrupt Customs official who was willing to help the

defendant move money without detection for a bribe of $10,000. Their conversation

was recorded. The following is an excerpt of the conversation:

**UC**: *what exactly do you need me to do?*

**Enriquez:** *receive*

**Enriquez:** *I need a hangar, you know?*

**CI:** *a hangar?*

**Enriquez:** *yeah, because I need to take all the money out.*

**UC:** *once you get there, I'll take you over. You tell me where you want the money and*

*ill move it all. That way, no one even looks because I carry stuff all the time.*

**Enriquez:** *ok. Put half in the truck. and the other one I put half in your aircraft*

**UC:** *When are you looking to do this?*

**Enriquez:** *Every month Today's the 8th? maybe in twenty-two days.*

**UC:** *He and I have a deal for what I help him with. You and I are going to have to figure out what's this worth to you? Because I can't do this for free. I put myself out there. I've got to get paid too.*

**Enriquez:** *OK, how much?*

**CI:** *I told you ten grand*

**Enrique:** *ten grand? Ok.*

**UC:** *ten thousand and I'm good*

**Enriquez:** *ten grand per month?*

**UC:** *per month*

**Enriquez:** *ok*

**UC:** *yep. Every trip*

**Enriquez:** *ok that's good. No problem*

**Enriquez:** *I need every month. Because it's a lot*

**Enriquez:** *first I need to close the GIII*

**CI:** *how long before you pay the balance?*

**Enriquez:** *I think this week. All of it*

**Enriquez:** *The guy is scared driving that much money. They move it in different cars. I don't know why but they say that troopers, there's a lot of troopers on the freeway.*

**CI:** *I'm going to need you to tell me whose name the bill of sale goes into*

**Enriquez:** *I'll tell you later.*

**CI:** *if it's a Mexican name, I need a copy of a passport or an ID card.*

Defendant's Initials _JP_      21

**Enriquez:** *don't matter if the guy is dead?*

**CI:** *I don't care.*

**Enriquez:** *ok*

**Enriquez:** *I can't call you on this phone. Because this is for work. You don't know who calls me on this phone. You don't know. You know, if somebody you know, the DEA or something*

**Enriquez:** *This phone I'm burning in maybe three or four days. And broken. I'm buying another one because the big people call me here.*

**CI:** *when your pilots come and take the plane off, will you go with the plane?*

**Enriquez:** *No, I never fly in this aircraft.*

**CI:** *No?*

**Enriquez:** *this aircraft is only for work. I can't fly there*

**CI:** *but it hasn't worked yet*

**Enriquez:** *Well, they'll have a record of you landing in Mexico. If you on board, I don't know maybe not, but if the government catch the aircraft, they check the record. If your name is there.*

**CI:** *I understand*

On June 10, 2021, the CI reported that he received an unexpected telephone call from the co-defendant. The co-defendant stated that he had just arrived at the Orlando International Airport (MCO). The co-defendant stated that the defendant was picking him up from the airport and that they needed to meet. The CI agreed,

Defendant's Initials __JPF__          22

and later met with the defendant and co-defendant at a hangar located at the Sanford International Airport (SFB). This conversation was recorded. The following is an excerpt of the conversation:

**Mendez**: *So the reason I'm here is because they can't bring the money here local because they're scared. Because they don't have licenses and they're scared to move that much money and get pulled over. So I'm here basically because I'm going to go pick it up. And then, him and I, we're going to fly to Atlanta and were going to pick up down there and drive back.*

**Mendez**: *We're going to pick up what's here local, there's a large amount here local*

**CI:** *How close are they?*

**Mendez**: *There's one that's like twenty minutes from Orlando and there's another that's like two hours from here.*

**Mendez:** *I'll go, I'll drive, close this up. So I'm going to drive. He's here with me, were going to pick it up. I mean obviously I know why, because they're scared to get pulled over, they don't have licenses, they'll get deported.*

**CI:** *Are they Mexican?*

**Mendez:** *Yeah*

**Mendez:** *I got my friend going to picking up the rest of it up north and then it'll all be here.*

**CI:** *How much are you going to give me today?*

**Mendez:** *A hundred thousand*

Defendant's Initials J P E          23

**Mendez:** *He brought me, because they're scared to bring the money. I'm here to get the money*

**Enriquez:** *The problem is the guy, he don't have his license*

**CI:** *How'd he get it this far?*

**Mendez:** *Somebody brought it to him and he was supposed to bring it this way.*

**Mendez:** *It's a little complicated when it's coming through ground obviously. And its coming from different places. It's all the same source but its different places.*

**CI:** *You want to meet back here in how long?*

**Mendez:** *He's waiting for them to confirm where we can go pick it up*

**CI:** *So you all are leaving and going to Clewiston?*

**Mendez:** *Clewiston and Orlando, come back, meet you tonight give you some. Then were flying out to Atlanta, get the rest, and then I got another guy to pick up the rest, he's one of my guys, so not an issue.*

Later that night, the defendant and co-defendant met with the CI and UC in the parking lot of a hangar at SFB. This conversation was recorded. The following is an excerpt of the conversation:

**Mendez:** *There's eighty. We're going to go get the rest.*

**Mendez:** *We'll see you Saturday, because we've got to drive down there.*

**CI:** *You're flying out tonight though*

**Mendez:** *No, we couldn't a flight. We're going to drive*

**Mendez:** *Well, we're going on mission number two. You have a good night*

Defendant's Initials ͞J P G      24

**Enriquez:** *See you on Saturday and Sunday*

During this meeting the defendant and co-defendant provided a Nike shoe box containing $80,000. The cash was bundled in stacks of different denominations which were held together by rubber bands, this was not consistent with picking up cash from a bank.

## June 14, 2021 Meeting

On June 14, 2021, the defendant and co-defendant met with the CI and UC at a hangar near SFB. The defendant and co-defendant brought a black backpack containing $150,000. The co-defendant explained that was all they could pick up in Atlanta. The co-defendant explained that the rest of the money may come in the form of a wire transfer at a later date. The co-defendant also stated that once they completed payment for this aircraft, they wanted to pay another $50,000 for the down payment of another GIII aircraft the CI was selling. The co-defendant explained that they would leave the CI with the $50,000 and come back in three weeks to pay for the second aircraft.

The $150,000 was bundled in stacks of different denominations which were held together by rubber bands. Some of the currency was also bagged in freezer bags marked "30" with a black marker.

## June 17, 2021 Meeting

On June 17, 2021, the defendant and co-defendant met with the CI at a restaurant in Oviedo, Florida. The co-defendant asked the CI if he would be willing

Defendant's Initials _J P F_        25

to have the remainder of the money provided in a wire transfer. The CI explained if they wanted to do a wire transfer it would have to go to escrow. Then, the co-defendant explained that it would be better if they waited on the money and stated, "because you got to understand where their money is coming from." The co-defendant explained that they planned to buy several planes from the CI and stated "All your airplanes are sold already. We let everyone know we have this, this, and this available." The co-defendant explained he was opening a consulting company in Texas under a limited liability company. At that point, the defendant interjected "To keep it legal and buy your aircrafts." The co-defendant asked the CI if he would be willing to have a G-450 aircraft registered in his name, but that the defendant and others would be using it because "They can't have it under their name in the US." The defendant and co-defendant explained that the money they picked up to pay for the aircraft was "money owed" and they met people in parking lots and took bags of cash from them. Finally, the co-defendant stated that they would need approximately ten more days to get the rest of the cash owed for the aircraft.

## June 25, 2021 Meeting

On June 25, 2021, the defendant and co-defendant met with the UC and the CI at a hangar at SFB with the intent to pay the remaining $370,000.00 towards the purchase of aircraft N400AA. Initially, the defendant and co-defendant arrived with a third, unidentified, male and without cash. The unidentified male stayed in the vehicle during the entire meeting.

The co-defendant explained he would be leaving, but the defendant would stay to see the aircraft leave. The defendant and co-defendant explained the aircraft would be most likely flying directly to Toluca, Mexico. The co-defendant told the UC and the CI that they were going to go retrieve the money from their hotel. The co-defendant also stated he was "the one who went and picked everything up" from Nashville and Atlanta and that he "hadn't slept for three days." The co-defendant explained that is why he had the unidentified male with them, stating "Luckily I brought my buddy with me, who's been driving for me." The co-defendant confirmed they still owed $370,000.00 for the aircraft.

Approximately thirty minutes later, the defendant and co-defendant came back to the hangar. Upon arrival, the co-defendant placed a brown duffle bag into the CI's open trunk and then closed the trunk. The defendant and co-defendant then went inside and met with the CI and UC. The co-defendant spoke about trying to get Mexican Insurance on the aircraft and explained he was working to get pilots for the aircraft but asked the CI if he/she could also work on finding pilots.

The currency was in different denominations, bundled in stacks, and held together by rubber bands. Some of the currency was sealed in plastic wrapping. The currency was transported to the HSI Orlando office and secured in accordance with agency guidelines. An official count of the currency totaled $363,820.00.

Defendant's Initials ⏵ P F            27

### June 29, 2021 Meeting

On June 29, 2021, the CI and UC met with the defendant and co-defendant at SFB. They spoke about getting Mexican airplane insurance and hiring pilots. The defendant expressed his concern that the aircraft had vinyl tail numbers and he believed Mexico required painted tail numbers. The co-defendant then asked the CI "You can get us another GIII next month?" The CI agreed to continue looking.

The defendant and co-defendant explained to the UC that as soon as the N400AA aircraft landed in Mexico, they would be coming back in twenty-five days with drugs and would pay the UC $25,000.00 to let the drugs into the country. Then, the defendant, co-defendant, UC, and the CI went outside to look at the aircraft. While heading outside, the co-defendant told the UC "we have to prove to them we can deliver this first one, after that, we'll see you once a month." The co-defendant added, "as long as we can deliver this one, we will get the green light, and we have a list of ten aircrafts they want. So, we just have to prove to them we can deliver this one. This is like the test for us."

### July 2, 2021 Interview of Mendez and Enriquez

On July 2, 2021, the CI met with the defendant and co-defendant at SFB in order to make all the arrangements to have the aircraft leave and planned to watch the aircraft depart. When the CI arrived, the co-defendant gave the CI another $6,000.00. This was the remaining balance for the purchase of the aircraft. The defendant explained that he needed a new plane in twenty-five days and would be

Defendant's Initials __J P E__      28

back to purchase another GIII from the CI. The co-defendant explained to the CI that he paid approximately $10,000.00 for a special permit to be able to fly into Mexico with the current vinyl tail number. According to the co-defendant, the tail number would be painted once it landed.

At that time, Homeland Security Investigations (HSI) Orlando Special Agent (SA) Scott Weigman and HSI Task Force Officer (TFO) Kyle Coffman approached the co-defendant and asked if he would be willing to talk about N400AA. The co-defendant agreed to speak.

While SA Weigman and TFO Coffman interviewed the co-defendant, other law enforcement officers interviewed the defendant.

The defendant provided TFO Rivera with four forms of identification: a Mexican passport, a driver's license (MX), voter identification card (MX), and an aviation mechanic's license (MX).

Defendant said he is an aircraft mechanic by trade and works for a company in Mexico fixing planes. While working, defendant stated that he was approached by a Mexican aircraft broker and asked if he would fly to Orlando, Florida, to inspect an aircraft for him. Defendant agreed and said he was going to be paid between $1,500 - $2,000 plus travel expenses. Defendant claimed to have no interest in the aircraft other than the pre-buy inspection. Defendant denied ownership of the aircraft and denied having any real knowledge of the transaction. Defendant was unsure who was buying the aircraft in Mexico. Defendant claimed the aircraft was

Defendant's Initials _J P F_     29

being flown to Mexico for final inspection, and that once the buyer inspected the plane in Mexico the sale would be finalized. Defendant stated the purchase of the plane was being handled through an escrow company and the buyers were sending money by wire transfer.

Defendant advised that the co-defendant was only there to assist with translation because his English was poor, and that the co-defendant was an aircraft mechanic who was helping him with the maintenance issues. Later, defendant admitted that while in Florida he helped collect cash for the purchase of the plane. Defendant indicated he knew what the plane was going to be used to ship cocaine.

Defendant's Initials ⏜𝑃𝐸          30